## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JONATHAN MORRISON NORRIS,    )
                              )
        Petitioner,    )
                              )
        v.                )      1:17CR242-1
                              )      1:19CV795
UNITED STATES OF AMERICA,    )
                              )
        Respondent.    )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommended ruling on Petitioner's Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence ("Section 2255 Motion") (Docket Entry 62; <u>see also</u> Docket Entry 63 (Memorandum in Support)).[1] For the reasons that follow, the Court should deny the Section 2255 Motion.

<u>INTRODUCTION</u>

This Court (per now-Chief United States District Judge Thomas D. Schroeder) previously entered a Judgment against Petitioner imposing a prison term of 285 months, after a jury found him guilty of conspiracy to distribute 500 grams or more of a methamphetamine mixture, to manufacture a methamphetamine mixture, and to possess materials for manufacturing methamphetamine, in violation of 21

---

[1] Parenthetical citations refer to Petitioner's above-captioned criminal case.

U.S.C. § 846 (Docket Entry 48; <u>see also</u> Docket Entry 1 (Indictment); Docket Entry 28 (Verdict)).  Petitioner appealed (Docket Entry 50), but the United States Court of Appeals for the Fourth Circuit affirmed, <u>United States v. Norris</u>, 739 F. App'x 204 (4th Cir. 2018).[2]  Petitioner thereafter timely filed the Section 2255 Motion (Docket Entry 62), claiming "deni[al of] effective assistance of counsel" (<u>id.</u>, ¶ 12(Ground One) (all-caps font omitted)), in that "[t]rial counsel was ineffective by: a. [f]ailing to advise [Petitioner] regarding two (2) plea offers[;] b. [m]isadvising [Petitioner] regarding Government's burden at trial for conviction[;] c. [f]ailing to investigate controlling law of the [C]ircuit[; and] d. [f]ailing to object to improper jury instructions" (<u>id.</u>, ¶ 12(Ground One)(a) (internal brackets omitted)).  As support for those four, ineffectiveness sub-claims, Petitioner incorporated his "Memorandum in Support (pages 1-12)" (<u>id.</u>), which included these pertinent allegations:

1) "[o]n February 27, 2017, a grand jury in th[is d]istrict . . . returned an indictment charging [Petitioner] and thirty-one others[ for a drug] conspiracy" (Docket Entry 63 at 3 (referring to <u>United States v. Bost</u>, No. 1:17CR53, Docket Entry 1 (M.D.N.C. Feb. 27, 2017) (the "17CR53 Indictment")));

---

[2] Petitioner did not seek review by the United States Supreme Court.  (<u>See</u> Docket Entry 62, ¶ 9(g).)

2) "[a]t some point in April or May 2017, the Government offered [Petitioner] a plea-agreement without a stipulated term or imprisonment" (id.), but "[trial counsel] failed to explain the benefits and implications of either accepting or rejecting the Government's offer" (id.; see also id. at 7 ("Petitioner, to this day, does not have knowledge or understanding of the terms of that first plea offer . . . ." (internal brackets omitted)));

3) "[Petitioner] assum[ed] at the time, regardless if he pleaded guilty or proceeded to trial [on the 17CR53 Indictment] and was convicted, he would receive the maximum sentence which could be imposed under [21 U.S.C.] § 841([b])(1)[(C) of] 240 months of imprisonment" (id. at 3);

4) "[h]aving been explained no upside to accepting the Government's offer [to plead guilty to the 17CR53 Indictment], [Petitioner] rejected it and opted to proceed to trial" (id.; see also id. at 7 ("[Trial c]ounsel never explained to [Petitioner] that, by not accepting th[at] plea [offer], the Government would likely seek a superseding indictment which would impose a mandatory minimum sentence in the case."), 8 ("[Trial counsel] did not explain that the Government would likely file an enhancement increasing the statutory mandatory minimum sentence. . . . [Trial c]ounsel offered no advice as to whether or not it would be beneficial for [P]etitioner to accept the plea [offer to plead guilty to the 17CR53 Indictment]."));

3

5) "[on] June 16, 2017[, trial counsel] sent [Petitioner] a letter explaining that [trial counsel] was waiting on a superseding indictment . . . [which he believed would] increase[] the maximum punishment to life from the current 20 year max[imum]" (id. at 3);

6) "[t]h[at letter] was the first time that [Petitioner] had any indication that rejecting the plea offer made by the Government could have serious implications" (id.);

7) "[o]n June 26, 2017[, a] grand jury [for this District] returned [an Indictment in this case] amending the language [of object one of the conspiracy charge in the 17CR53 Indictment] to include the allegation that the conspirators conspired to distribute 500 grams or more of methamphetamine" (id. (referring to Docket Entry 1, hereinafter "17CR242 Indictment"));

8) "[w]hile reviewing the [17CR242 I]ndictment with [Petitioner], [trial counsel] explained that . . . the Government would be required to prove that [Petitioner] had conspired to distribute at least 500 grams of methamphetamine in a single transaction" (id. at 4 (emphasis omitted); see also id. at 1 (asserting that "[trial counsel] told [Petitioner] the Government would be required to prove, beyond a reasonable doubt, that [he] had conspired to distribute 500 grams or more of methamphetamine in a single transaction" (emphasis omitted)), 9 ("[Trial] counsel told [P]etitioner that, based on the language in object one of the [17CR242 I]ndictment, the Government would be required to prove

4

[P]etitioner participated in a single methamphetamine transaction of at least 500 grams or more for a conviction on object one." (emphasis and internal brackets omitted)));

9) "[Petitioner], certain that he had never conspired to distribute 500 grams or more of methamphetamine in a single transaction, was confident the Government's proof at trial would fall short of the legal standard [trial counsel] had explained would be required for conviction" (id. at 4);

10) "[d]espite meeting with [trial counsel] several more times to prepare for trial, [Petitioner] never heard another word from [trial] counsel regarding the Government's burden at trial" (id. at 9; see also id. ("Therefore, [P]etitioner continued to believe the Government had to meet an erroneous threshold for conviction on object one." (internal brackets omitted)));

11) "[o]n September 11, 2017, prior to jury selection, the Government offered [Petitioner] another plea-agreement" (id. at 4), with "a term of imprisonment of 77-96 months" (id.); and

12) "[Petitioner], based solely on the inaccurate advise [sic] of [trial] counsel regarding the proof required for a conviction on object one [in the 17CR242 Indictment], rejected the Government's plea offer" (id.; see also id. at 1 ("Had [trial counsel] done any research regarding the issue of drug weight aggregation before incorrectly advising [Petitioner], he would have found the issue had already been . . . decided by the Fourth Circuit . . . in

5

United States v. Collins, 415 F.3d 304 (4th Cir. 2005)."), 10 (alleging that, if trial counsel had given "accurate" advice about single-transaction issue, "Petitioner would have accepted the Government's second plea-agreement offer and pleaded guilty in exchange for a 77-96 month sentence" (internal brackets omitted))).

The United States responded in opposition (see Docket Entry 69; see also Docket Entry 69-1 (Declaration of Petitioner's counsel))[3] and Petitioner replied (see Docket Entry 70). The Court

_____

[3] In the above-cited Declaration, Petitioner's trial counsel gave verified statements contradicting Petitioner's above-quoted allegations; in particular, trial counsel averred (A) that, at a meeting "on April 24[, 2017" (Docket Entry 69-1 at 2), he advised Petitioner about the offer to "plead guilty to conspiracy to distribute an unspecified amount of meth[amphetamine] with a maximum imprisonment of 20 years" (id.); (B) that, "[a]t [that] meeting on April 24[, Petitioner] informed [trial counsel] that [Petitioner] was innocent and that he would contest the charges" (id. at 3), (C) that, "[a]t [a] meeting on May 26, [2017,] despite [Petitioner's] stated intention to go to trial, [trial counsel] specifically advised [Petitioner] to plead guilty to conspiracy to distribute an unspecified amount of meth[amphetamine]" (id.), and further "advised that if he did not plead guilty the Government would obtain a superseding indictment alleging conspiracy to distribute 500 grams or more of meth[amphetamine] which would carry a minimum mandatory 10 years and a maximum of life" (id. at 3-4), while also (i) "warn[ing him that] the Government would file an information of prior conviction that would require upon conviction a minimum mandatory 20 years with a maximum of life" (id. at 4), (ii) "advis[ing him] that the quantity of meth[amphetamine] attributable to him and to the conspiracy was huge and there was no telling how much meth[amphetamine] would be attributed to him if he went to trial, resulting in a sentence in excess of 20 years" (id.), and (iii) explaining that "[a] guilty plea to a 20 year maximum would allow [him] to try for a downward variance" (id.), (D) that, "[d]espite [trial counsel's] advice to plead guilty, and despite the fact that [Petitioner] could face over 20 years, [he] stated he would not plead guilty" (id.), (E) that "[trial counsel]
(continued...)

(per the undersigned Magistrate Judge) set an evidentiary hearing (see Text Order dated June 13, 2022) and appointed new counsel (Seth Neyhart) for Petitioner (see Docket Entry 93; see also Text Order dated July 25, 2022 (granting Petitioner's Motion for Continuance (Docket Entry 94)); Text Order dated Aug. 22, 2022 (granting Petitioner's Motion for Continuance (Docket Entry 97)).) After the evidentiary hearing (and preparation of the transcript) (see Docket Entry 99), the parties filed written arguments (see Docket Entries 102, 103).

---

[3](...continued)
visited [Petitioner] on June 29[, 2017,] gave him a copy of the [17CR242 I]ndictment" (id.), and "said that . . . he would face a minimum mandatory 10 years with maximum of life and[,] after the Government filed an information of prior conviction, . . . a minimum mandatory 20 years with maximum of life" (id. at 4-5), but that "the Government would still allow him to plead guilty to a count capping imprisonment to 20 years" (id. at 5), (F) that "[Petitioner] stated he would go to trial" (id.), (G) that "[trial counsel] did not say that the Government must prove at least one transaction involved 500 or more grams of meth[amphetamine]" (id.; accord id. at 7-8, 10, 11), (H) that, "[o]n September 7, [2017, the Government] informed [trial counsel] that [Petitioner] could still plead guilty to a count that would subject him to a 20 year maximum" (id. at 6), (I) that "[trial counsel] conveyed th[at] offer to [Petitioner] and [they] discussed it thoroughly but [Petitioner] rejected it" (id.), (J) that, "[s]ometime on the first day of trial . . .[, the Government] told [trial counsel] that [Petitioner] could still take a plea to a count that carried a maximum of 20 years" (id.), (K) that, "[trial counsel] thoroughly discussed th[at] offer with [Petitioner] but he rejected it" (id.), and (L) that "[t]he Government made no offer to stipulate to a guideline range" (id.; see also id. at 8 ("The Government did not make a highly favorable plea offer on the eve of trial. The Government did make the same offer as it had from the beginning . . . ."), 9 ("[T]he Government did not offer to let [Petitioner] plead guilty to a term of imprisonment of 77-96 months.")).

7

<u>DISCUSSION</u>

The Constitution guaranteed Petitioner effective assistance of counsel in his criminal case. <u>See</u> U.S. Const. amend. VI; <u>McMann v. Richardson</u>, 397 U.S. 759, 771 n.14 (1970). To make out an ineffective assistance claim, Petitioner must prove that his counsel's performance fell below a reasonable standard for defense attorneys and that prejudice resulted. <u>See Strickland v. Washington</u>, 466 U.S. 668, 687-94 (1984). "Surmounting <u>Strickland</u>'s high bar is never an easy task. . . . [T]he standard for judging counsel's representation is a most deferential one." <u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011) (internal quotation marks omitted); <u>see also</u> <u>Strickland</u>, 466 U.S. at 694 (defining prejudice as "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

<u>Sub-claim a. (Plea Offers)</u>

Ground One of the Section 2255 Motion first asserts that "[t]rial counsel was ineffective by: a. [f]ailing to advise [Petitioner] regarding two (2) plea offers[.]" (Docket Entry 62, ¶ 12(Ground One)(a).) This ineffectiveness sub-claim fails as a matter of law, because the credible testimony at the evidentiary hearing establishes that trial counsel fully advised Petitioner about all plea offers made by the United States (all of which involved him pleading guilty to a methamphetamine mixture distribution conspiracy with a 20-year maximum prison sentence).

8

In that regard, trial counsel – who, at the time of Petitioner's prosecution in 2017, had spent roughly a quarter-century defending clients charged with federal crimes in this Court (see Docket Entry 99 at 54-55) – credibly testified that:

1) on "April 24th" (id. at 57), trial counsel "g[a]ve [Petitioner] a copy of the [17CR53 I]ndictment, went over the charges[ and] maximum punishments" (id.), and "told him . . ., from having conversation with [the Government, that] he could . . . enter a plea with a 20-year max[imum]" (id.);

2) "on May 26th, . . . [trial counsel] advise[d Petitioner] to accept that 20-year maximum plea –– it was still open –– [and] that there were at least ten witnesses or more who were going to come testify" (id. at 58; accord id. at 66; see also id. at 59-60 ("I had advised him specifically after that month [from April 24 to May 26 that] I had been working [on the case] long enough that I thought it was incumbent upon me to advise him to plead guilty."));

3) "[trial counsel also then] specifically said [that,] if [Petitioner] did not accept the plea, [] the Government would seek a different indictment charging 500 grams or more of methamphetamine" (id. at 58-59; accord id. at 60), as well as that, "because the Government could and, in [trial counsel's] opinion

9

certainly would file an information [of prior conviction]" (<u>id.</u> at 59), "Petitioner would face a mandatory 20 years" (<u>id.</u>);[4]

4) "[trial counsel additionally] talked about how . . . going to trial [meant] . . . there's no telling what the maximum amount of meth[amphetamine] attributed to [Petitioner], if he's convicted, at sentencing would be" (<u>id.</u>; <u>see also</u> <u>id.</u> at 66 (recounting advice as follows:  "'If you go to trial, there is no telling what the outcome is going to be when it comes to the quantity of drugs . . . .'")), but trial counsel told Petitioner that, if he lost at trial, his sentence "'would be more than 20 years'" (<u>id.</u> at 66);

5) "[although trial counsel] could not tell [Petitioner] that if he accepted . . . the plea agreement what sentence he would get, [trial counsel explained that Petitioner] would certainly have a chance of getting acceptance [of responsibility credit] and maybe a downward variance" (<u>id.</u> at 59), and "at least it would cap [his prison term] at 20 [years]" (<u>id.</u>; <u>see also</u> <u>id.</u> at 67 (summarizing advice to Petitioner about taking plea offer thusly:  "[W]e could try to get the judge to vary down.  There was not a minimum

---

[4] "A conspiracy involving . . . [500 grams or more of a methamphetamine mixture] normally carries a mandatory minimum sentence of 10 years.  However, if the defendant [commits such offense] after a prior conviction for a felony drug offense has become final, and the government provides the defendant with the required notice, the mandatory minimum sentence increases to 20 years." <u>United States v. Washington</u>, 574 F. App'x 262, 263 (4th Cir. 2014) (internal citations, emphasis, and quotation marks omitted) (citing 21 U.S.C. §§ 841(b)(1)(A) and 851(a)).

mandatory.  [Petitioner] would have pled guilty and accepted
responsibility . . . .  Maybe the quantum of drugs is going to be
less.  The probation officer in the report might be finding less
than if you have however many witnesses testif[ying at trial].”));

6) “on June 29th, . . . [trial counsel] delivered the [17CR242
I]ndictment [to Petitioner] and [trial counsel] again recommended
a guilty plea” (id. at 61), as “[the Government] said [Petitioner]
could still plead to a 20-year max[imum]” (id.; see also id. at 62
(“I delivered the [17CR242 I]ndictment . . . [and] still
recommended that he take that [20-year-maximum plea offer] and
let’s cap it . . . .”));

7) subsequently, “on the day before trial, [trial counsel]
went to the jail” (id. at 67; see also id. (“It was a Sunday.”)),
“[a]nd [trial counsel] said [to Petitioner that] the Government
would still let him plea [to the 20-year maximum]” (id.); and

8) “on the day of trial, [the Government] one more time said
[Petitioner] can accept the plea [to the 20-year maximum]” (id. at
68; see also id. (“There was no mention of . . . a specified
guideline range or a specified sentence.  That was not ever on the
table. . . . [Counsel for the Government] said, ‘You can plead to
the 20-year cap.’  [That offer] had remained the same throughout
pretrial.”)), which renewed offer trial counsel “conveyed” (id.).

Trial counsel’s foregoing “testimony on the material factual
issues [was] credible,” Diaz v. United States, Nos. 7:09CR100,

11

7:11CV43, 2014 WL 7384974, at *5 (E.D.N.C. Dec. 29, 2014) (unpublished), including because it "was matter-of-fact, not adversarial, in tone," id., and because of the absence of any "evidence that [he] had any incentive to lie," United States v. Solomon, 24 F. App'x 148, 151 n.1 (4th Cir. 2001). Conversely, Petitioner "ha[d] an obvious incentive to misstate the truth," Cruz-Rea v. United States, No. 3:11CV166, 2015 WL 5785744, at *2 (S.D. Ind. Sept. 30, 2015) (unpublished), as this collateral challenge "represents perhaps the only remaining avenue open to [him] to potentially escape service of [his] extended prison term," Diaz, 2014 WL 7384974, at *8. Additionally, Petitioner's "testimony conflict[ed] with his prior statements," Diaz, 2014 WL 7384974, at *7, and actually refuted many of the allegations he originally submitted in support of this ineffectiveness sub-claim.

For example, Petitioner asserted in the Memorandum in Support that (A) "[trial counsel] failed to explain the benefits and implications of either accepting or rejecting the Government's offer [to plead guilty to the 17CR53 Indictment]" (Docket Entry 63 at 3), (B) "[trial c]ounsel never explained to [Petitioner] that, by not accepting th[at] plea [offer], the Government would likely seek a superseding indictment which would impose a mandatory minimum sentence" (id. at 7), and (C) "[trial counsel] did not explain that the Government would likely file an enhancement increasing the statutory mandatory minimum sentence" (id. at 8);

12

however, at the evidentiary hearing, Petitioner admitted (D) that, "in [his] communications with [trial counsel about that plea offer], [trial counsel] told [Petitioner] that[,] if [he] didn't [accept that] plea [offer], the Government was going to pursue the second indictment" (Docket Entry 99 at 38) (see id. at 38-39 ("Yes, he mentioned that. . . . He just explained that it would be probably a superseding indictment.")), (E) that trial counsel conveyed that the new indictment "was going to change what [Petitioner was] looking at as far as statutory minimums and statutory maximums" (id. at 39), i.e., that, "if [Petitioner] declined th[at] first plea offer, the second indictment that was going to come was going to change [the conspiracy charge]" (id.), such that "[Petitioner] didn't have a statutory maximum of 20 years anymore" (id.) (see id. ("Yeah, I knew that.")), and (F) that "[trial counsel] also explained to [Petitioner] the Government could file the information of prior conviction" (id.), which "also would contribute to . . . increasing the sentence that [he] would face" (id.) (see id. at 40 ("Right."); see also id. at 41 (answering "Yes" when asked if trial counsel told Petitioner "[he] could be exposed to a greater sentence . . . if [he] did not take the plea offer on the first indictment")).[5]

_____

[5] Those sworn admissions also contradicted Petitioner's statement in the Memorandum in Support that a letter from trial counsel in June 2017 "was the first time that [Petitioner] had any
(continued...)

Another glaring inconsistency between the Memorandum in Support and Petitioner's hearing testimony concerns the assertion in the former that, "[o]n September 11, 2017, prior to jury selection, the Government offered [Petitioner] another plea-agreement" (Docket Entry 63 at 4), which provided for "a term of imprisonment of 77-96 months" (id. (emphasis added)). In contrast, at the evidentiary hearing, Petitioner gave this testimony:

> [Trial counsel] came to me [on the morning of trial] and spoke to me about a plea.
>
> . . . .
>
> . . . [H]e said, "Before we pick a jury, the Government is offering a plea." And he gave me a number -- a specific number of, like -- 87 months I remember.

(Docket Entry 99 at 14-15 (emphasis added); see also id. at 44-45 (repeating that, "right before this trial started back in September of 2017," trial counsel "came to [Petitioner] and said that the Government was offering a plea agreement" to "87 months").)

Moreover, Petitioner testified that "[trial counsel] never came to [Petitioner] with a range" (id. at 45), and admitted (albeit evasively) knowing about the false claim of a 77-to-96-month offer in the Memorandum in Support, when he filed it:

> Q. [Y]ou reviewed your filing, right, your [M]emorandum [in Support]?

---

[5](...continued)
indication that rejecting the plea offer made by the Government could have serious implications" (Docket Entry 63 at 3).

14

A.  Yes.

Q.  And in that, you said it was a 77- to 96-month plea.

A.  I understand.  The guy that was writing this for me had said it would probably be a range.  I tried explaining to him that it was a certain number, but when he wrote it up, he wrote it up as a range for whatever purpose he had in his mind.  I don't know.

. . . .

Q.  You read that, though?

A.  The fact is I'm -- we're not attorneys.  We do the best we can.

Q.  Of course.  But you read that in the [M]emorandum [in Support], though, right?

A.  Yes.

Q.  And you did not correct it?

A.  At the time I asked -- I asked the guy doing it, and he said because they -- because they go by terms like that or however -- like 151 to 188 or whatever, he goes, "This is probably the best way to write it."  So I just took his opinion on that.

Q.  So you knew that that was not accurate when your [M]emorandum [in Support] was filed?

A.  Well, I know it was in that range.

Q.  But that's not what, according to you, the offer was.

A.  No, [trial counsel] did not come to me and say 77 to 96.  No, ma'am, he did not.

(Id. at 45-46.)[6]

---

[6] Petitioner also inconsistently testified first that "all [he] ever heard of the Government doing" (Docket Entry 99 at 8), was "offer[ing] an open plea with 0 to 20 or 0 to 10 or 10 to life"
                                                      (continued...)

15

Put plainly, Petitioner repeatedly and materially has "change[d] his story . . . [and] the very fact that he made inconsistent statements would tend to undermine his credibility," Latif v. Obama, 677 F.3d 1175, 1206 (D.C. Cir. 2011) (Henderson, J., concurring in the judgment) (internal ellipsis and quotation marks omitted). Furthermore, "the testimony of [Petitioner] lacked the earmarks of credibility . . . as [it] was both evasive and internally inconsistent. . . . [From] observ[ing his] demeanor . . .[,] it was apparent . . . that h[is] responses were . . . contrived." United States v. Ponce-Duarte, No. 3:11CR97, 2011 WL 2791244, at *1 (W.D.N.C. July 14, 2011) (unpublished); see also The Adela, 73 U.S. 266, 267-68 (1867) ("The credibility of the[ witnesses'] statements was much impaired by their evasive character."); Diaz, 2014 WL 7384974, at *7 (listing, as reasons for rejecting the petitioner's account, fact that his "testimony conflict[ed] with his prior statements," that "his testimony itself was inconsistent," and that "[o]ther testimony by [the] petitioner [wa]s undermined by the record").

In sum, given trial counsel's long record of professional service in this Court, trial counsel's credible testimony regarding his thorough advice to Petitioner about all plea offers (including

---

[6](...continued)
(id.), but later that "[he had] seen quite a few people that had scripted pleas" (id. at 37), i.e., pleas to a "specific number of months" (id. at 36).

the fact that they uniformly provided for a 20-year maximum prison sentence, without a specific number or range of months), and the total lack of credibility of any and all conflicting testimony from Petitioner, the Court should deem the Section 2255 Motion's first ineffectiveness sub-claim "wholly incredible," Denton v. Hernandez, 504 U.S. 25, 33 (1992), and should reject it as "factually frivolous," id. Alternatively, even if the Court concluded that trial counsel provided inadequate advice about the Government's plea offers, the record still forecloses relief on this sub-claim, because Petitioner cannot establish prejudice. More specifically:

> To show prejudice from ineffective assistance of counsel where a plea offer has . . . been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer had they been afforded effective assistance of counsel. Defendants must also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it . . . .

Missouri v. Frye, 566 U.S. 134, 147 (2012).

Petitioner's evidentiary hearing testimony precludes a finding of any such prejudice. To begin, Petitioner testified that he continuously asserted his innocence throughout the life of this case. (See, e.g., Docket Entry 99 at 25-26 ("Q. Wasn't it at th[e first substantive] meeting [with trial counsel] that you conveyed to [him] that you were innocent of these charges? A. Well, yes, I was. Q. And that was a position that you maintained throughout the entirety of your relationship with [him]; isn't that right? A.

17

Yes.  Q.  That you were innocent of these charges?  A.  Yes. . . .
Q.  . . . [W]hen the [17CR53 I]ndictment did not have the 500 grams
[or more of methamphetamine mixture allegation], your position was,
'I'm innocent.  I want to go to trial'?  A.  Right."), 28 ("Q.
. . . [A]fter the [17CR242 I]ndictment ha[d] come out, did your
trial strategy position change?  A.  Change as in?  Q.  Were you
now saying that rather than innocent, the Government just couldn't
meet its burden?  A.  No, I still say I was innocent . . . ."), 32-
33 ("Q.  Didn't you tell the probation office that your argument
was that you were innocent of these charges?  A.  Yes.  Q.  And
then you maintained that argument at sentencing when the Court
spoke to you, didn't you?  A.  I did.  Q.  And didn't you say that,
'I'm still just maintaining my innocence is all I'm doing.'?  A.
I did tell the judge that, yes."), 38 ("Q.  [Y]ou maintained your
innocence of these charges?  A.  Yes."), 41 ("Q. [ Y]ou did not
take th[e 20-year maximum] plea offer.  You maintained your
innocence.  A.  Correct."); see also id. at 57 (documenting trial
counsel's testimony that, "on [April] the 24th, [Petitioner] told
[trial counsel] that [Petitioner] was innocent of the charges
. . . [and] would go to trial"), 61 ("[O]n June 29th, . . . [trial
counsel] again recommended a guilty plea. . . . But [Petitioner's]
position was still the same; that he was innocent; the witnesses
were lying."), 64 ("It was always, 'They're lying.  I'm not
guilty.").)

Equally significantly, Petitioner also testified that "[he] still say[s] that [he] was innocent." (Id. at 33 (emphasis added); see also id. ("I would tell you that today.").) Then, when asked "[h]ow [he was] going to plead guilty in this case if [he] w[as] innocent?" (id. at 47-48), Petitioner first appeared to make an about-face on the issue of his guilt and to request a do-over, all in a halting manner indicative of someone "basically making up his testimony as he went along," Latin Am. Music Co., Inc. v. Spanish Broad. Sys., Inc., 254 F. Supp. 3d 584, 590 (S.D.N.Y. 2017), aff'd, 738 F. App'x 722 (2d Cir. 2018): "I've been found guilty, and I -- at that time I was pleading my innocence, and we all know that I'm not innocent. So I'm just, you know, trying to go back and accept my responsibility for what I did." (Docket Entry 99 at 48.)

From that point, Petitioner's testimony took various twists and turns – which included a confession that he lied during the sentencing hearing (quickly qualified) – before ultimately ending with an admission only to using drugs (not to conspiring to distribute and to manufacture a methamphetamine mixture as charged in the 17CR53 Indictment and the 17CR242 Indictment):

> THE COURT: But my question is how -- how were you going to plead guilty in this case? Were you going to tell the judge that you were guilty?
>
> THE WITNESS: Yes.
>
> THE COURT: But you weren't guilty?
>
> THE WITNESS: Yes, I was guilty.

19

THE COURT:  You were guilty?

THE WITNESS:  Yes, I was guilty.

THE COURT:  So when you told the judge you were innocent at sentencing, you were lying to the judge?

THE WITNESS:  Yes.

THE COURT:  All right.

THE WITNESS:  In part, yes.

THE COURT:  Well, what part?

THE WITNESS: I wasn't exactly guilty of everything that was attributed to me, but I am a user.  So in part, I was purchasing usable amounts for myself during the conspiracy that they had us on.  So, yes, at that -- at that part I was guilty.

THE COURT:  You were guilty of the drug conspiracy that you were charged with?

THE WITNESS:  Yes.

THE COURT:  All right.  Go ahead, Mr. Neyhart. Redirect?

MR. NEYHART:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. NEYHART:

Q.  With respect to your answer to His Honor's question just now, what exactly is it that you believed you were guilty of beyond, if anything, using the methamphetamine produced in this conspiracy?

A.  I'm -- I'm a drug addict.  So do I know some of the people that were in the conspiracy?  Yes.  Did I ever use any of the drugs that was in the conspiracy?  Probably, yes.  But so far as being the head honcho or however they put it, no; buying and selling kilos of meth, no.

20

Q.  Now, in your statement to the judge that you made right now about -- do you understand -- or is it your understanding that somehow being involved in a one-pot method or using things that were produced in a one-pot method would make you guilty of that conspiracy?

A.  I don't know.  I don't understand what a one-pot method is, so I'm a little lost on that.

Q.  Okay.  So in the original conspiracy that was alleged, there was sales of methamphetamine that were -- that was presumably produced and imported into North Carolina; is that correct?  Some people were --

A.  Yeah, it was produced somewhere, yes.

Q.  And was there also some methamphetamine that was being produced locally?

A.  I have no idea.

Q.  Okay.  It's your testimony that you -- you were involved at least to the extent of using methamphetamine that was involved in this conspiracy?

A.  Yes.

(Id. at 48-50 (bold font omitted).)

Given that record (and borrowing the words of a neighboring court confronted with analogous circumstances), the undersigned Magistrate Judge "does not credit [Petitioner's] testimony at the evidentiary hearing and his attempt to rewrite history and proclaim that he would have signed [a] plea agreement [the United States actually offered] with the proper advice," Spence v. United States, Nos. 2:11CR4, 2:15CV45, 2017 WL 6272254, at *9 (E.D.N.C. Dec. 8, 2017) (unpublished), appeal dismissed, 737 F. App'x 168 (4th Cir. 2018); see also Merzbacher v. Shearin, 706 F.3d 356, 367 (4th Cir.

21

2013) ("[A petitioner's] self serving assertion that he would have accepted [a] plea is . . . the type of testimony subject to heavy skepticism." (internal ellipsis and quotation marks omitted)). Even construing Petitioner's testimony as charitably as possible (which solicitude that evidence does not warrant), "this is a situation where [P]etitioner, in hindsight, now wishes to revive and accept the first plea offer he received.  This falls far short of showing prejudice under *Strickland*." Mann v. United States, 66 F. Supp. 3d 728, 741 (E.D. Va. 2014); see also id. at 740-41 ("[The] petitioner's steadfast adherence to his not guilty plea . . . flatly contradicts his assertion that he would have accepted the government's first plea offer.").

Simply stated, Petitioner has not carried his burden on Strickland's prejudice prong, i.e., he has "demonstrate[d neither] a reasonable probability [he] would have accepted the earlier plea offer," Frye, 566 U.S. at 147, nor "a reasonable probability the plea would have been entered without the prosecution canceling it or th[is C]ourt refusing to accept it," id. See, e.g., Merzbacher, 706 F.3d at 366-67 ("[I]t is entirely clear that to demonstrate a reasonable probability that he would have accepted a plea, a petitioner's testimony that he would have done so must be credible."); United States v. Rangel, No. 5:14CR556-2, 2019 WL 3562684, at *7 (D.S.C. July 16, 2019) (unpublished) ("[B]ased upon [the petitioner's] own testimony at the evidentiary hearing, as he

22

continued to maintain his innocence and lack of guilt, combined with the testimony of his trial counsel, the court cannot conclude that there was a reasonable probability that [the petitioner] would have accepted a plea offer from the [g]overnment or that the plea-bargaining process would have been different with competent counsel by the preponderance of the evidence." (internal quotation marks omitted)), <u>appeal dismissed</u>, 788 F. App'x 214 (4th Cir. 2019).

For all of these reasons, the Court should deny relief on the Section 2255 Motion's sub-claim that "[t]rial counsel was ineffective by: a. [f]ailing to advise [Petitioner] regarding two (2) plea offers" (Docket Entry 62, ¶ 12(Ground One)(a)).

<u>Sub-claim b. (Misadvice about Government's Burden) and Sub-claim c. (Failure to Investigate Controlling Law)</u>

Via the next two (inter-related) sub-claims in the Section 2255 Motion, Petitioner has alleged that "[t]rial counsel was ineffective by . . . b. Misadvising [Petitioner] regarding [the] Government's burden at trial for conviction[, and] c. Failing to investigate controlling law of the [Fourth C]ircuit[.]" (Docket Entry 62, ¶ 12(Ground One)(a) (internal brackets omitted).) Just as with Petitioner's first sub-claim, the record (including all the credible testimony at the evidentiary hearing) refutes those second and third sub-claims of trial-counsel-ineffectiveness and requires their rejection.

23

As an initial (highly noteworthy) matter, Petitioner's own testimony <u>directly contradicts</u> the (repeated) assertions in his Memorandum in Support that, "[w]hile reviewing the [17CR242 I]ndictment with [Petitioner], [trial counsel] explained that, based on the allegation in . . . object one, the Government would be required to prove that [Petitioner] had conspired to distribute **<u>at least</u>** 500 grams of methamphetamine in a **<u>single</u>** transaction" (Docket Entry 63 at 4 (emphasis in original); <u>see also</u> <u>id.</u> at 1 (asserting that "[trial counsel] told [Petitioner] the Government would be required to prove, beyond a reasonable doubt, that [Petitioner] had conspired to distribute 500 grams or more of methamphetamine in a single transaction" (emphasis omitted)), 9 ("After the grand jury handed down the [17CR242 I]ndictment on June 26, 2017, [trial counsel] met with [Petitioner] to discuss the implications of the [17CR242 I]ndictment and prepare for trial. During that first meeting[, trial] counsel told [P]etitioner that, based on the language in object one of the [17CR242 I]ndictment, the Government would be required to prove [P]etitioner participated in a single methamphetamine transaction of at least 500 grams or more for a conviction on object one." (emphasis and internal brackets omitted))). (<u>See</u> Docket Entry 99 at 29 ("Q. So [trial counsel] never made an affirmative representation to you that the Government had to prove 500 grams of methamphetamine or more in one transaction? A. Not definitive, no."); <u>see also</u> <u>id.</u> at 10-13

24

(memorializing Petitioner's testimony that, at his first meeting
with trial counsel after return of 17CR242 Indictment,
"[Petitioner] asked about if it was 500 grams or more in one sale,
and [trial counsel] said he would find out" and that (in subsequent
meetings) "[Petitioner] mentioned it a couple of times, asked
[trial counsel] if he found anything out yet on that or a for sure
answer," but that "[trial counsel] just told [Petitioner that trial
counsel] ha[d]n't found out," while quoting trial counsel as
stating "'I haven't found anything yet'"), 27-28 ("Q.  When you
brought it up to [trial counsel] this first time, what did he say
to you? A.  He said, 'Good question.'  And he said he would check
and find out what the law is on that. . . .  Q.  So it's your
contention here today . . . that you relied upon a statement by
[trial counsel] that the Government had to prove the 500 grams in
one transaction?  A.  Wait a minute.  You said a statement by
[trial counsel]?  Q.  What he told you.  A.  Right.  Like I said,
he said that -- he was supposed to find out for me the truth,
whether it was 500 or more grams in one sale of aggregated amounts,
but it was never brought up again."), 29 ("Q.  So [trial counsel]
never came back to you and said definitively about what the law
said? A.  Not definitively, no."), 42 ("I'm waiting on information
[about the single-transaction issue] . . . and the information
never came.").)

25

Trial counsel also credibly testified that "[he] did not say . . . at any [] time that the Government had to prove 500 grams or more in one transaction. . . . [He] could not say that because [he] didn't have any support for that [proposition]." (Id. at 63; see also id. at 74 ("[D]id I advise [Petitioner] the Government has to prove one instance of 500 grams -- well I know what I didn't say. I did not say that . . . .").)[7] In addition, the record (including trial counsel's credible testimony) dictate the conclusion that Petitioner did not refuse any plea offer because of any failure of trial counsel to adequately research the single-transaction (or aggregation) issue. First, as detailed in the preceding subsection, Petitioner's evidentiary-hearing testimony confirms that he consistently framed his rejection of plea offers as a function of his innocence of involvement in a conspiracy to distribute/manufacture a methamphetamine mixture of any scale.[8]

Second, Petitioner's testimony about his interactions with trial counsel in relation to the single-transaction issue belies

_____

[7] In deeming credible trial counsel's above-quoted testimony, the undersigned Magistrate Judge took note, in particular, of the delivery of such testimony in a "matter-of-fact, not adversarial, . . . tone," Diaz, 2014 WL 7384974, at *5, and the lack of "evidence that [trial counsel] had any incentive to lie," Solomon, 24 F. App'x at 151 n.1.

[8] Notably (in that regard), "th[e 17CR53 I]ndictment didn't have this 500 grams [or more] of methamphetamine [mixture issue]" (Docket Entry 99 at 26), but "[Petitioner's] position was 'I'm innocent'" (id.) and "'I want to go to trial'" (id.).

26

any suggestion that single-minded focus on that issue influenced Petitioner's plea-related decision-making. By way of illustration, although Petitioner testified that (A) he brought up the single-transaction issue at his first meeting with trial counsel after the 17CR242 Indictment's return, whereupon "[trial counsel] said he would find out" (id. at 10; accord id. at 27-28), (B) Petitioner, "[a]fter that first meeting after the [return of the 17CR242 I]ndictment, . . . follow[ed] up with [trial counsel]" (id. at 11), by "mention[ing the single-transaction issue] a couple of times[ and] ask[ing] if he found anything out yet" (id.; accord id. at 29, 43; but see id. at 28 ("[Trial counsel] was supposed to find out for me the truth, whether it was 500 or more grams in one sale or aggregated amounts, but it was never brought up again." (emphasis added))), and (C) "the issue of 500 or more grams [wa]s the most important issue" (id. at 11), Petitioner also incongruously testified that he chose to proceed to trial (and, yet again, to reject a plea offer) despite never having received an answer about that "most important issue" (id.) (see id. at 13 ("Q. Did you talk to [trial counsel] again the morning of trial about this question? A. Yes, I did. Q. And what did he tell you at that time? A. He just said we're going to try and put it in front of the -- in front of the Court and see what happens."); see also id. at 13-18 (discussing rejection of plea offer on morning of trial)).

27

Then (according to Petitioner), in the midst of trial, upon "hear[ing trial counsel] say that this [single-transaction] argument basically didn't carry weight" (id. at 31), Petitioner neither "ask[ed] any questions about what happened" (id. at 32), nor "ever br[ought] this issue up with [trial counsel] again" (id.). Moreover, despite testifying to the exact words trial counsel supposedly spoke to Petitioner in that moment (see id. at 31 ("[Trial counsel] leaned over and said, 'Hey, we've got this *Collins* case. It's not 500 or more grams in one sale. It's aggregated amounts.'")), Petitioner answered "I don't know" (id.), when asked whether he "sa[id] anything to [trial counsel]" (id. at 31; see also id. at 34 ("I can't remember exactly what I said other than, you know, I'm very disappointed that it was aggravated [sic] amounts . . . . At that point it was a curse word I said. . . . Cursed under my breath."")).[9]

---

[9] When given another chance to relate "[a]nything else [he] told [trial counsel]" (Docket Entry 99 at 34), Petitioner testified: "I was, like, 'What do we do now?'" (Id. at 35.) However, Petitioner's memory of that exchange proved equally ephemeral. (See id. at 35-36 ("THE COURT: I'm asking what [trial counsel] told you when you asked him, 'What do we do now?' [Petitioner]: I can't remember exact words. THE COURT: . . . [D]o you remember the gist of what . . . [trial counsel] said when you asked him, 'What do we do now?' [Petitioner]: I can't remember. I think -- I don't know. I don't think there was much of a conversation after that. I was kind of disappointed. . . . THE COURT: What I asked you was what [trial counsel] said. [Petitioner]: I can't remember." (bold font omitted).)

28

In the simplest terms, Petitioner's portrayal of the sequence of events surrounding the single-transaction issue – (1) his admitted, innocence-based, refusal to plead guilty to the 17CR53 Indictment (which contained no 500-grams-or-more allegation), (2) his purported fixation on the single-transaction issue from the moment of the 17CR242 Indictment's return until trial, (3) his inexplicable decision to begin the trial (and to reject a renewed plea offer) without any resolution of the single-transaction issue, and (4) his muted reaction to (and amnesiac-like lack of recall about the aftermath of) trial counsel's mid-trial report of adverse precedent on the single-transaction issue – makes no sense.[10] Conversely, trial counsel's credible testimony traces an entirely believable course by which this case traveled:

1) after trial counsel reviewed the 17CR53 Indictment with Petitioner "on [April] the 24th, [Petitioner] told [trial counsel] that [Petitioner] was innocent of the charges[ and] that he would go to trial" (id. at 57);

2) "as [Petitioner and trial counsel] got into more meetings" (id. at 58), discussing specific witnesses and their anticipated trial testimony, Petitioner's "whole strategy was, as [he] said, the witnesses were lying, that they were lying to get a reduced sentence" (id.), "[b]ut that he was innocent of the charges" (id.);

---

[10] More bluntly, Petitioner's "version of events . . . is not credible." Cruz-Rea, 2015 WL 5785744, at *2.

3) when trial counsel advised Petitioner to plead guilty to the 17CR53 Indictment to avoid re-indictment for "a [Section 841](b)(1)(A) offense" (id. at 60), issues regarding proof of "[t]he quantities of drugs never came up" (id.);

4) after the return of the 17CR242 Indictment in June 2017 (just as trial counsel had warned), trial counsel "again recommended a guilty plea" (id. at 61; see also id. ("[The Government] said [Petitioner] could still plead to a 20-year max[imum]."), "[b]ut [Petitioner's] position was still the same; that he was innocent; the witnesses were lying" (id.);

5) trial counsel "brought [the single-transaction issue] up on August 23rd, . . . three weeks to trial, and . . . about three months after [Petitioner's and trial counsel's first] substantive meeting in April" (id. at 62; see also id. at 60 ("I remember I brought it up; [Petitioner] didn't ask me. I hadn't really ever thought about . . . whether the Government would have to prove one incident was at least 500 grams, and I made a notation of that, that I wanted to check it out."), 62 ("[W]hat I wrote in my notes was: 'Instruction, hyphen, does Government have to prove 500 grams at one time, or is it cumulative?'"), 73 (confirming that trial counsel's "note [from August 23 concerned issue] about the instruction the judge would give [the jury] regarding [drug] quantity," i.e., "whether [the jury] would have to find the [500 grams or more] amount in a single instance")));

6) to that point, "pretty far down the line[, Petitioner's] whole strategy is the witnesses are lying, not [contesting the] quantum of drugs" (id. at 62; see also id. at 79 (testifying that had, "in June, [Petitioner] brought up to [trial counsel] this issue of the Government having to prove a single instance of 500 grams," trial counsel "[was] fairly certain [he] would have made a note of that and would have checked it out then"), 95 ("[T]hat was not an issue that we had ever discussed, other than the one time that I think I brought it up on the 23rd of August."));

7) "[trial counsel and Petitioner] never even discussed [the single-transaction issue] after that one time that [trial counsel] made a notation of it" (id. at 61; see also id. at 61-62 ("[I]t was never an issue even after I brought that up . . . . [H]is position was still the same."), 70 ("I went through all my notes.  There was nothing in my notes."), 80 ("[I]t wasn't ever brought up again."), 96 ("After th[e] 23rd of August when one of us brought it up -- I think I did -- it was never discussed again."));

8) between the meeting on August 23 and the start of trial on September 11, "[trial counsel] went and tried to do some research to see if there was any case law on [the single-transaction issue]" (id. at 62), but "[he] didn't find anything" (id.);

9) "[trial counsel also] consulted [the] legal research and writing attorney in the Federal Public Defender['s Office], and she didn't know the answer" (id.);

31

10) in any event, "there were many reasons why th[e single-transaction issue] was not going to be any defense at all" (id. at 63), e.g., "there was a [co-conspirator], who testified at trial, [who] had accepted [a delivery of] 30 pounds of methamphetamine" (id.), and thus "the jury could have found[,] even if . . . it had to be one transaction, [that] there was evidence in the record of at least 500 grams" (id.; see also id. ("I could have discussed that with [Petitioner], but he didn't ask me about it."));

11) nor did Petitioner "ever express to [trial counsel] that . . . if the Government did not have to prove one transaction of 500 grams or more that he wanted to plead guilty" (id. at 64; see also id. ("The issue of quantum [of drugs] never came up. It was always, 'They're lying. I'm not guilty.'"));

12) in fact, despite "[trial counsel repeatedly] advis[ing Petitioner] to accept the [20-year-maximum] plea" (id. at 66), "[Petitioner] never had wavered about going to trial" (id. at 67);

13) accordingly, "[trial counsel] accepted [Petitioner's] decision that we're going to trial, and . . . there was a lot of preparation on each witness . . . [as to] possible cross-examination, et cetera, but not on [the issue of proof of] quantum [of drugs]" (id. at 72; see also id. at 63 ("[I]f he had asked me again [after August 23 about the single-transaction issue], I would have run th[at issue] to the ground."), 82 ("I never had any reason

to believe that was an important issue to him."), 96 ("It was never brought up as an important issue to him."));

14) still, trial counsel felt he should "raise, as a defense counsel, anything that [he] think[s] could be an issue, and because [he] hadn't found [a] direct answer [either way on the single-transaction issue, he decided to] raise[] it" (id. at 64), i.e., "[he] made the decision that [he] was going to raise th[e single-transaction issue] as an issue at [the] Rule 29 [stage]" (id. at 62; see also id. at 69 ("[T]actically, . . . that would be kind of like hiding in the weeds. If there is an issue on this, if there is anything I can make of this in the future, I'll let the Government present their case, [and then I will] make the Rule 29 [motion]. . . . It's just trying to make sure I raise anything that could possibly be beneficial."));

15) consistent with that decision, once the Government had presented most of its evidence, trial counsel "'alert[ed] the Court, as [he had] told [counsel for the Government], that [Petitioner would] take the position that the law is or should be in the Fourth Circuit that the Government must prove that there is at least one incident amounting to 500 grams of methamphetamine [mixture] as opposed to . . . aggregating amounts'" (id. at 87 (quoting Docket Entry 39 at 4); see also id. at 88 (continuing to read from trial transcript: "'I don't have any authority for my position, and this case that [counsel for the Government just] gave

33

to believe that was an important issue to him."), 96 ("It was never brought up as an important issue to him."));

14) still, trial counsel felt he should "raise, as a defense counsel, anything that [he] think[s] could be an issue, and because [he] hadn't found [a] direct answer [either way on the single-transaction issue, he decided to] raise[] it" (id. at 64), i.e., "[he] made the decision that [he] was going to raise th[e single-transaction issue] as an issue at [the] Rule 29 [stage]" (id. at 62; see also id. at 69 ("[T]actically, . . . that would be kind of like hiding in the weeds. If there is an issue on this, if there is anything I can make of this in the future, I'll let the Government present their case, [and then I will] make the Rule 29 [motion]. . . . It's just trying to make sure I raise anything that could possibly be beneficial."));

15) consistent with that decision, once the Government had presented most of its evidence, trial counsel "'alert[ed] the Court, as [he had] told [counsel for the Government], that [Petitioner would] take the position that the law is or should be in the Fourth Circuit that the Government must prove that there is at least one incident amounting to 500 grams of methamphetamine [mixture] as opposed to . . . aggregating amounts'" (id. at 87 (quoting Docket Entry 39 at 4); see also id. at 88 (continuing to read from trial transcript: "'I don't have any authority for my position, and this case that [counsel for the Government just] gave

33

me, it's the *Collins* case at 415 F.3d 304.  I'm going to see what the Fourth Circuit said in that.  I know [counsel for the Government is] taking the position that . . . it's an . . . aggregated amount.  I just wanted the Court to be aware that that would come up.'" (quoting Docket Entry 39 at 4))); and

16) ultimately, "at the Rule 29 [hearing], . . . [trial counsel] didn't abandon the issue" (id. at 90; see also id. ("I said we would preserve it." (referring to Docket Entry 39 at 167))), but the Court (per now-Chief Judge Schroeder) ruled "[t]here[ was] certainly sufficient evidence from which the[ jury] could conclude there [wa]s a conspiracy to distribute 500 grams or more of methamphetamine" (Docket Entry 39 at 174-75).

To summarize, the credible evidence of record shows that (A) Petitioner always maintained his innocence of any involvement in a conspiracy to distribute/manufacture a methamphetamine mixture, regardless of the quantity alleged, (B) Petitioner rejected all plea offers made by the Government because of his asserted innocence, (C) Petitioner insisted on a trial defense constructed around the theory that the cooperating witnesses all lied to obtain sentence reductions, (D) trial counsel spent a great deal of time scrutinizing witness statements and preparing cross-examination to mount that defense, (E) trial counsel flagged the single-transaction issue as a possible jury instruction matter on August 23, 2017, shortly before trial, (F) trial counsel

34

investigated the single-transaction issue by conducting his own legal research and by consulting a subject-matter expert, but did not uncover any authority on point, (G) Petitioner never asked trial counsel about the single-transaction issue, either before or after August 23, 2017, (H) trial counsel never told Petitioner that the Government had to prove that the conspiracy involved distribution of 500 grams or more of a methamphetamine mixture in a single transaction, and (I) trial counsel decided to pursue the single-transaction issue in the Rule 29 context (despite having found no supporting authority and having concluded that the trial evidence included proof of distributions of 500 grams or more of a methamphetamine mixture), in order to preserve all potentially beneficial arguments in the most tactically advantageous manner.

In light of those circumstances, the Court should conclude that trial counsel's handling of the single-transaction issue did not constitute professionally unreasonable representation and, coordinately, that Petitioner has not substantiated his core allegation that, "based solely on the inaccurate advise [sic] of [trial] counsel regarding the proof required for a conviction on object one [of the 17CR242 Indictment], [Petitioner] rejected the Government's plea offer" (Docket Entry 63 at 4). As a result, the Court should rule that Petitioner's ineffectiveness sub-claims b. and c. fall short on Strickland's first (deficient performance) prong. In the alternative (and assuming that trial counsel should

35

have located the <u>Collins</u> decision before trial[11]), for the reasons discussed at length in the preceding subsection, these two sub-claims also falter on <u>Strickland</u>'s second (prejudice) prong, because Petitioner has not "demonstrate[d] a reasonable probability [he] would have accepted the [Government's actual] plea offer," <u>Frye</u>, 566 U.S. at 147, or "a reasonable probability the plea would have been entered without the [Government] canceling it or th[is C]ourt refusing to accept it," <u>id.</u>

Sub-claim d. (Failure to Object to Jury Instructions)

According to Petitioner's final sub-claim, "[t]rial counsel was ineffective by . . . d. Failing to object to improper jury instructions[.]" (Docket Entry 62, ¶ 12(Ground One)(a); <u>see also id.</u> (providing no "[s]upporting facts" regarding jury instruction sub-claim and directing reader to "[s]ee attached Memorandum in Support (Pages 1-12)").) Petitioner did not develop this sub-claim in his Memorandum in Support. (<u>See</u> Docket Entry 63 at 6-11

---

[11] The mere fact that trial counsel failed to locate <u>Collins</u> does not establish constitutionally deficient performance. <u>See, e.g.</u>, <u>Woodruff v. Warden, Perry Corr. Inst.</u>, C.A. No. 9:07-2739, 2008 WL 4200291, at *7 (D.S.C. Sept. 8, 2008) (unpublished) ("[R]epresentation by counsel must only be objectively reasonable, not flawless or to the highest degree of skill. Inherent in this standard is the acknowledgment that even the most skillful defense attorneys are bound to make mistakes . . . . If the legal system were to afford prisoners a cause of action merely for demonstrating that, in hindsight, their trial counsel could have done something better, the court system would be choked with habeas petitions . . . ." (internal citation and quotation marks omitted)), <u>appeal dismissed</u>, 326 F. App'x 698 (4th Cir. 2009).

36

(omitting any reference to jury instructions in "ISSUES PRESENTED FOR REVIEW" and "ARGUMENT" sections).  Moreover, the Memorandum in Support mentions jury instructions only in this one line (within the section entitled "Statement of Pertinent Facts within Petitioner's Knowledge" (id. at 3 (all-caps font omitted))):  "In their opinion [affirming Petitioner's conviction], the [Fourth Circuit] noted that [trial] counsel failed to object to th[is ] Court's jury instruction explaining how to determine the amount of drugs personally attributable to [Petitioner]."  (Id. at 5.)

The United States, in its opposition to the Section 2255 Motion, (A) noted that "[Petitioner] d[id] not address th[is sub-]claim in his [M]emorandum [in Support]" (Docket Entry 69 at 12), and (B) argued that, consistent with the Fourth Circuit's conclusion that "the evidence [at trial] 'overwhelmingly' established that [Petitioner] was personally responsible for the threshold quantity of methamphetamine" (id. at 13 (quoting Norris, 739 F. App'x at 205)), Petitioner could not carry his burden (under Strickland) of "showing that [he] was prejudiced by [trial] counsel's alleged error[ in opting against objecting to the jury instruction on drug quantity]" (id.).  Petitioner, in reply, offered no counter-argument to the lack-of-prejudice argument by the United States and, in fact, made no mention of jury instructions.  (See Docket Entry 70 at 1-5.)

37

Rule 2(b) of the Rules Governing Section 2255 Proceedings (just like parallel Rule 2(c) of the Rules Governing Section 2254 Cases) not only mandates that a motion under Section 2255 identify each ground for relief, but also "explicitly requires that a petitioner [therein] summarize the facts supporting each of the alleged grounds for relief," <u>Adams v. Armontrout</u>, 897 F.2d 332, 333 (8th Cir. 1990). <u>See</u> Rule 2(b), Rules Governing Section 2255 Proceedings ("The motion must: (1) specify all the grounds for relief available to the moving party; [and] (2) state the facts supporting each ground[.]"). Furthermore, each ground's supporting facts "must consist of sufficient detail to enable the [C]ourt to determine, from the face of the petition alone, whether the petition merits further habeas corpus review." <u>Id.</u> at 334. "The burden is on [Petitioner] to point out any factual issues . . . . It is not the Court's burden to comb the record looking for possible factual issues." <u>United States v. Thornton</u>, No. 3:05CR184, 2013 WL 12330642, at *1 (S.D. Ohio July 25, 2013) (unpublished); <u>see also</u> <u>Zambrana v. United States</u>, 790 F. Supp. 838, 843 (N.D. Ind. 1992) ("Even pro se litigants are held to minimal standards of pleading and motion practice, and in framing their grounds for § 2255 relief it is well for them to remember [that] . . . [j]udges are not like pigs, hunting for truffles buried in briefs." (internal quotation marks and italics omitted)).

38

Petitioner did not comply with the foregoing standards in connection with sub-claim d. As a result, it "is vague, conclusory, speculative, and unsupported and fails for all these reasons." Cabrera v. United States, Nos. 1:09CR323-1, 1:12CV695, 2014 WL 6386902, at *9 (M.D.N.C. Nov. 14, 2014) (unpublished) (Osteen, C.J.); see also United States v. Dyess, 730 F.3d 354, 359 (4th Cir. 2013) ("[V]ague and conclusory allegations contained in a § 2255 petition may be disposed of without further investigation by the [d]istrict [c]ourt." (internal quotation marks omitted)).

And even if the Court overlooked those defects, any ineffectiveness claim for failure to object to the jury instructions' lack of specific directions regarding the method for finding the drug quantity attributable to Petitioner, see generally Collins, 415 F.3d at 312-14 (holding that, in determining drug quantities under Section 841(b)(1) in drug conspiracy cases, jury must apply principles outlined in Pinkerton v. United States, 328 U.S. 640 (1946)), could not satisfy Strickland's prejudice requirement (as the United States argued in its response to the Section 2255 Motion, without contest from Petitioner in his reply), given the Fourth Circuit's prior ruling that "the evidence overwhelmingly demonstrate[d] that [he] was personally involved in the distribution of more than 500 grams of methamphetamine," Norris, 739 F. App'x at 205. See Denton v. United States, Nos. 5:16CR60-3, 5:21CV81, 2022 WL 2865861, at *5 (E.D.N.C. June 21,

39

2022) (unpublished) ("[On direct appeal], the Fourth Circuit held
that the overwhelming and uncontroverted trial evidence established
that at least 50 grams of methamphetamine were attributable to [the
petitioner] . . . . This forecloses [his] attempt to show that he
was prejudiced by his attorneys' failure to object to the *Collins*
error. . . . Thus, [the p]etitioner's [ineffective assistance of
counsel] claim based on the *Collins* error [] fails . . . under
*Strickland*." (internal ellipses and quotation marks omitted)),
recommendation adopted, 2022 WL 2840478 (E.D.N.C. July 20, 2022)
(unpublished); see also United States v. Rangel, 781 F.3d 736, 743–
45 (4th Cir. 2015 ("[The petitioner ] argues that his trial counsel
rendered ineffective assistance because he did not request an
instruction stating that the jury must determine drug weight using
*Pinkerton* principles. . . . In light of the overwhelming evidence
that [the petitioner] was responsible for substantially more than
50 kg of marijuana[,] . . . there was no reasonable probability
that the jury would have attributed less than 50 kg to [him].
. . . Having failed to demonstrate a reasonable probability of a
different outcome, [the petitioner] does not satisfy *Strickland*'s
prejudice prong on this issue. [His] trial counsel, therefore, did
not render constitutionally ineffective assistance by failing to
request an instruction to determine drug weight based on *Pinkerton*
principles under *Collins*.").

<u>CONCLUSION</u>

Petitioner has not shown entitlement to collateral relief.

**IT IS THEREFORE RECOMMENDED** that the Section 2255 Motion (Docket Entry 62) be denied, without a certificate of appealability.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

October 18, 2022